UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED
02 MAY 28 PM 3:0

N.D. OF ALABAMA

| | |
|---|---|
| **FRANCIS MARK CRAWFORD and BECKY CRAWFORD,** | ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) Civil Action No. CV-99-S-2041-S ) |
| **BELL HELICOPTER/TEXTRON; and DYNCORP,** | ) ) ) |
| Defendants. | ) |

ENTERED
MAY 28 2002

## MEMORANDUM OPINION

Plaintiffs, Francis Mark Crawford and his wife Becky Crawford, assert various tort claims against defendant Bell Helicopter/Textron ("Bell"), arising from a helicopter crash that occurred on May 1, 1999. The action presently is before the court on Bell's motion for summary judgment (doc. no. 21).

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

In making this determination, the court must review all evidence and make all

> reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)) (internal quotation marks and citations omitted); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).

Plaintiff Francis Mark Crawford is a civilian employee of the United States Army who was injured in a crash of a Bell UH-1H helicopter in Shelby County, Alabama, on May 1, 1999. The helicopter's vertical fin separated from the fuselage, causing the aircraft to crash.

Following the accident, the helicopter's tailboom and vertical spar were examined by representatives of the Army's Analytical Investigation Branch and Bell's Field Investigations group at the Corpus Christi, Texas Army Depot. The Army's Analytical Investigation Branch concluded that "[t]he fin spar, P/N 205-030-846- (All Dash Numbers) failed from fatigue, originating in a rivet hole identified (by Bell convention) as 'number 2.' No obvious material deficiencies were noted."[1] Bell's investigators also found fatigue fractures, but did not find any metallurgical irregularities.[2]

The helicopter involved in the crash was manufactured by Bell for the United States Department of the Army pursuant to contract number DAA J01-71-C-0319 (P2B), executed on January 8, 1971. The helicopter was assigned serial number 71-20228, and it was accepted by the Army as conforming to the contract on September 11, 1972.[3] The tailboom and vertical fin spar on

---

[1] Designation of Evidentiary Materials in Support of Motion for Summary Judgment by Bell Helicopter Textron Inc. (doc. no. 22), Exhibit A, at 2.

[2] *Id.*

[3] *Id.*, Exhibit G.

the accident helicopter had been replaced with spare parts that originally were installed on another helicopter produced under the same contract, and assigned serial number 71-20117.[4] That helicopter had been accepted by the Army as conforming to the contract on May 27, 1972.[5] The accident helicopter was redesignated a UH-1V[6] on October 29, 1980, and, at the time of the accident, was being used as a medical transport helicopter.

Upon consideration of the pleadings, briefs, and evidentiary submissions, the court concludes Bell's motion for summary judgment is due to be granted.

## I. DISCUSSION

### A. The Government Contractor Defense

This case, like the Supreme Court's seminal decision in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988) (also addressing a helicopter crash),[7] requires this court "to decide when a contractor providing military equipment to the Federal Government can be held liable under state tort law for injury caused by a design defect." *Id.* at 502, 108 S.Ct. at 2513. In examining this issue, the *Boyle* Court reasoned that the liability of an independent contractor performing its obligation under a military-equipment procurement-contract implicates "uniquely federal" interests similar to those implicated by the civil liability of federal officials for actions taken in the scope of their duty, and is therefore governed by federal law. *Id.* at 505-06, 108 S.Ct. at 2515.[8]

---

[4] *Id.*, Exhibit N, at 47. It is not clear from the records when the tailboom assembly was replaced. *See* Bell Exhibit E.

[5] *Id.*, Exhibit H.

[6] The helicopter was redesignated as a UH-1V for medical evacuation.

[7] In *Boyle*, a CH-53D helicopter manufactured for the United States by the Sikorsky Division of United Technologies Corporation crashed off the coast of Virginia Beach, Virginia, during a training exercise. David A. Boyle, a United States Marine helicopter copilot, was unable to escape from the helicopter and drowned. *Boyle v. United Technologies Corp.*, 487 U.S. 500, 502, 108 S.Ct. 2510, 2513, 101 L.Ed.2d 442 (1988).

[8] For example, the *Boyle* Court observed that "[t]he imposition of liability on Government contractors will directly affect the terms of Government contracts: either the contractor will decline to manufacture the design specified

The Court held that where imposing liability on government contractors would create a "'significant conflict' between federal interests and state law," state law must be displaced. *Id.* at 507, 108 S.Ct. at 2518.

The Court focused on the "discretionary function" exception to the Federal Tort Claims Act,[9] 28 U.S.C. § 2680(a), stating:

> We think that the selection of the appropriate design for military equipment to be used by our Armed Forces is assuredly a discretionary function within the meaning of this provision. It often involves not merely engineering analysis but judgment as to the balancing of many technical, military, and even social considerations, including specifically the trade-off between greater safety and greater combat effectiveness. And we are further of the view that permitting "second-guessing" of these judgments through state tort suits against contractors would produce the same effect sought to be avoided by the FTCA exemption. The financial burden of judgments against the contractors would ultimately be passed through, substantially if not totally, to the United States itself, since defense contractors will predictably raise their prices to cover, or to insure against, contingent liability for the Government-ordered designs. . . . In sum, we are of the view that state law which holds Government contractors liable for design defects in military equipment does in some circumstances present a "significant conflict" with federal policy and must be displaced.

*Id.* at 511-12, 108 S.Ct. at 2518 (citation and footnote omitted). The Court adopted the three-part test formulated by the Ninth Circuit in *McKay v. Rockwell International Corp.*, 704 F.2d 444, 451 (9th Cir. 1983): *i.e.*, liability for design defects in military equipment cannot be imposed upon Government contractors under state tort law when "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not

---

by the Government, or it will raise its price. Either way, the interests of United States will be directly affected." *Boyle*, 487 U.S. at 507, 108 S.Ct. at 2515-16.

[9]28 U.S.C. § 2680(a) provides an exception to the United States' consent to suit for the negligent or wrongful conduct of federal employees for "[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

to the United States." *Boyle*, 487 U.S. at 512, 108 S.Ct. at 2518.

Here, as in *Boyle*, the manufacture of helicopters for the United States Army implicates a "uniquely federal interest," such that the displacement of state law is warranted. Application of the remaining aspects of the *Boyle* test leads the court to conclude that plaintiffs' claims based upon the allegedly defective product design are precluded by the government contractor defense.

1.  **"Reasonably precise specifications"**

The evidence presented by the parties demonstrates that Bell's UH-1H helicopters, such as the one at issue here, were designed according to reasonably precise specifications approved by the United States Army.

The government first contracted for development of the UH-1D helicopter, the predecessor model to the UH-1H, during the early 1960s. The UH-1D had a less powerful engine than the UH-1H, but was otherwise substantially the same in design.[10] The specifications for the UH-1D were used to produce the UH-1H, with the exception of the engine, until separate UH-1H specifications were prepared in 1970. Approximately six thousand UH-1H helicopters were manufactured for the Army using the UH-1D specifications, during the period from 1962 to 1970. Those helicopters were primarily used in combat in Viet Nam.

The contract between Bell and the Army required Bell to produce the UH-1H helicopters in accordance with model specification number 205-947-135, dated March 2, 1970.[11] The engineering drawings corresponding to the specification consisted of a "top drawing," which referenced the

---

[10] Designation of Evidentiary Materials in Support of Motion for Summary Judgment by Bell Helicopter Textron Inc. (doc. no. 22), Exhibit N, at 50-51.

[11] *Id.*, Exhibit C, at Bates stamp number 34.

drawings for each component of the helicopter.[12] Each drawing was required to be approved by an Army representative, as indicated by the appearance of the representative's name in the block marked "customer." The name of Ted Hall, a civilian engineer employed by the Army, appears in the "customer" block of the drawings at issue here.[13]

William Wilson, Bell's director of helicopter contracts and a Bell employee since 1968, described the development of the specification as follows:

> Any time that we [Bell] had a requirement from the government for a revision or a new detailed specification, we would prepare the specification in accordance with what we thought they desired. Normally, it was a change to a prior document.
>
> We would submit that specification to the government procurement offices. At this point in time — or this was about the point in time that it transitioned over to the Army. That would have been the Army officers in [the Aviation Command], St. Louis. They would have distributed those to their various technical offices for materials and engineering and data and all of the various specialties, prepared remarks and comments, and assembled a meeting to discuss their findings. And we, Bell, would have a team there of normally contracts and primarily engineering folks.[14]

Wilson described the meeting as "extensive," lasting several days.[15] The Army representatives and those from Bell reviewed the specifications together,

> paragraph by paragraph. And each of the particular Army specialty areas which would have had some input into some of them. Some of them the avionic specifications, some of them the structural requirements or whatever.
>
> And the output of this would have been yet another draft specification, which normally would get resubmitted and, again scrubbed and would go through the process until there was a specification that they were satisfied with.[16]

---

[12]*Id.*, Exhibit N, at 42-43.
[13]*Id.* at 43-44.
[14]*Id.* at 55-56.
[15]*Id.* at 56-57.
[16]*Id.* at 57.

To facilitate this cooperative process, Army personnel were physically located in Bell's main administration building. Moreover, some of the Army's engineering representatives occupied cubicles in Bell's Engineering Department, "so they could be in the real-time flow of the drawings."[17]

Notwithstanding the foregoing, plaintiffs assert that the Army delegated the discretion to design the UH-1H helicopter to Bell, and that the appearance of Hall's name on the specification drawings amounted to no more than a "rubber stamp" of Bell's design. The court finds this argument to be unavailing. Wilson's testimony, on which plaintiffs rely in support of this assertion, makes clear that, while Bell completed the engineering design drawings, those drawings incorporated military specifications as to materials and particular design elements.[18] An examination of the detail specification reveals that more than 60 military specifications were incorporated.[19]

Based on the foregoing, it seems clear that the Army was intimately involved with the development of the specifications used to manufacture the UH-1H helicopter. The Army's approval came at the end of a long and thorough review process, with revisions and refinements to the specifications proposed by Bell. Accordingly, the court finds that the Army approved reasonably precise specifications, and this prong of the *Boyle* test is met.

2.  **Conformance with the specifications**

> Nonconformance with a specification means more than that the ultimate design feature does not achieve its intended goal. The alleged defect must exist independently of the design itself, and must result from a deviation from the required military specifications. *Cf. Bailey v. McDonnell Douglas Corp.*, 989 F.2d 794, 800

---

[17]Designation of Evidentiary Materials in Support of Motion for Summary Judgment by Bell Helicopter Textron Inc. (doc. no. 22), Exhibit N, at 24.

[18]*Id.* at 34-36.

[19]*Id.*, Exhibit D, at Bates stamp number 46.

n. 13 (5th Cir. 1993) ("For the reasons explained infra, we interpret Boyle's statement that the defense bars '[l]iability for design defects,' to mean liability for defects in the government specifications.") (citation omitted). Extensive government involvement in the design, review, development and testing of a product, as well as extensive acceptance and use of the product following production, is evidence that the product line generally conformed with the government-approved specifications.

*Kerstetter v. Pacific Scientific Company*, 210 F.3d 431, 435-46 (5th Cir. 2000) (citing *In re Air Disaster at Ramstein Air Base, Germany*, 81 F.3d 570, 575 (5th Cir. 1996)).

The evidence reflects that the Army accepted the accident helicopter, serial number 71-20228, on September 11, 1972. The "Material Inspection and Receiving Report" was signed by Lessly Thompson on behalf of the Army, and the form indicates that the helicopter conformed to the contract.[20] The evidence also reflects that the Army accepted the helicopter with serial number 71-20117, from which the tailboom assembly was removed to replace that of the accident helicopter's, on May 27, 1972, and that the helicopter conformed to the contract.[21] Further, the Army accepted more than 10,000 such helicopters and used them for four decades.[22] The court therefore is convinced that Bell has demonstrated that the helicopters delivered to the Army conformed with the specifications. *See Kerstetter*, 210 F.3d at 435-36 ("Extensive government involvement in the design, review, development and testing of a product, as well as extensive acceptance and use of the product following production, is evidence that the product line generally conformed with the government-approved specifications."). Accordingly, the second prong of the *Boyle* test also is satisfied.

---

[20] *Id.*, Exhibit G.
[21] *Id.*, Exhibit H.
[22] *Id.*, Exhibit N, at 58.

3.  **Warnings**

Anton Stier, a retired employee of Bell, who had worked in "product support engineering" from 1969 until he retired in 1998, stated that it was Bell's normal practice to provide copies of all service and technical bulletins to Army representatives located on-site at Bell.[23] He also said that Bell and the Army representatives shared information with respect to problems each had encountered with the helicopters in both commercial and military settings.[24] Additionally, as discussed below, the evidence establishes that the Army was specifically aware of problems with the vertical fin spar.

At the time the subject accident occurred, the UH-1H helicopters were in the process of being retired, and were due to be completely phased out by 2004.[25] During the years prior to the Army's decision to retire its UH-1H fleet, the helicopters had periodically undergone so-called "organic overhauls." For the "organic overhaul," a helicopter was shipped to a facility, such as the Corpus Christi Army Depot, and was disassembled to "bare bones." The helicopter was thoroughly inspected and any needed repairs were made, in order to restore the aircraft to "near new" condition.[26] After the decision was made by the Army to phase out the UH-1H, those organic overhauls were no longer performed. Bell represents the following with respect to the phase-out of the UH-1H helicopter fleet:

> In the mid 1980s, the Army which had begun phasing out the [UH-1H] in favor of the more advanced Blackhawk helicopter, ceased the tear down to "Bare Bones" overhauls, previously performed by CCAD [Corpus Christi Army Depot] on [UH-1H helicopters]. (Monaco 79, EXHIBIT Q). At about the same time the Army began selling surplus [UH-1H helicopters], which were converted to civilian use by

---

[23]Designation of Evidentiary Materials in Support of Motion for Summary Judgment by Bell Helicopter Textron Inc. (doc. no. 22), Exhibit O, at 210.

[24]*Id.* at 210-11.

[25]*Id.*, Exhibit T, at 92.

[26]*Id.* at 96.

third parties, who made modifications and prescribed the use of the helicopter under an STC (Supplemental Type Certificate). Such STC's had been submitted to and approved by the FAA [Federal Aviation Administration], all without Bell's consent or participation. Most of these surplus [UH-1H helicopters] were used in the timber industry to lift logs out of remote places by use of a cable extended from the helicopter. This procedure is referred to as "repeated heavy lift operations" or "RHLs."[27]

The Federal Aviation Administration issued a "Priority Letter Airworthiness Directive" on September 17, 1997, reading in pertinent part as follows:

> This priority letter Airworthiness Directive (AD) is prompted by two accidents involving in-flight failures of the tailboom vertical fin spars (vertical fin spars) on Model TH-1L and UH-1B helicopters. One other accident occurred on a Model 205A-1 helicopter which is of similar type design. One of the accidents resulted in a fatality. As a result of these accident investigations, the FAA has determined that a large number of high-power events can cause fatigue cracks which will cause the vertical fin spar to fail. This condition, if not corrected, could result in in-flight failure of the vertical fin spar and subsequent loss of control of the helicopter.
>
> Since an unsafe condition has been identified that is likely to exist or develop on other Bell-manufactured Model ... UH-1H ... helicopters of the same type design, this priority letter AD requires, within 8 hours time-in-service (TIS) after the effective date of this AD, modification and inspection of the vertical fin spar. Then, at intervals not to exceed 8 hours TIS, further inspections of the vertical fin spar for cracks are required. If any crack is discovered, replacement of the vertical fin spar with an airworthy vertical fin spar is required before further flight.[28]

The directive, with which civilian operators were required to comply, mandated certain inspections and modifications (to facilitate inspection) of the helicopter's vertical fin spar.

The Army, although not obligated to comply with the FAA's Airworthiness Directives,[29] reviews them to determine their applicability to the military fleet. Following review of

---

[27] Brief in Support of Bell Helicopter's Motion for Summary Judgment (doc. no. 23), at 13.

[28] Designation of Evidentiary Materials in Support of Motion for Summary Judgment by Bell Helicopter Textron Inc. (doc. no. 22), Exhibit I, at 1.

[29] *Id.*, Exhibit P, at 88.

the directive, the Army decided not to implement its requirements, based on the Army's extensive experience with the aircraft (and no history of such problems), and because the helicopters were not regularly used by the Army for heavy lifting, or "high power events."[30]

Bell issued a "Military Alert Bulletin" on April 6, 1998, applicable to the UH-1H model helicopter. The Bulletin stated: "Cracks have been found on the tail boom vertical fin spar. The fatigue cracks originated from the rivet holes in the area of fin station 60 to 75. Loose rivets, debond of the doublers and corrosion contributed to cracking of the spar."[31] The Bulletin prescribed inspection procedures to be completed upon receipt of the bulletin, and each eight flight hours thereafter.

Again, the Army reviewed the warning and decided against implementation of the recommended course of action, based on the same factors it had reviewed in connection with the FAA Airworthiness Directive. Specifically, in a letter addressed to Representative Terry Everett, dated June 25, 1999, Daniel J. Rubery, Deputy to the Commanding General of the Army's Aviation and Missile Command, explained:

> First, the U.S. Army UH-1H/V flight spectrum[32] did not involve a high number of

---

[30]*Id.* at 94.

[31]*Id.*, Exhibit J, at 1.

[32]The original "mission" for the UH-1H utility helicopter was described in the March 2, 1970 specification as follows:

> The mission of this aircraft shall be to transport personnel; special teams or crews; equipment and supplies; medical evaluation; ambulance service from the battlefield to a medical installation and emergency ambulance service between two medical installations where facilities for fixed-wing aircraft are not available; to deliver protective fire by attachment of appropriate weapons; and as an instrument trainer. This aircraft shall be capable of performing these missions from prepared or unprepared takeoff or landing areas, under instrument operations, light icing conditions, day or night flying and to navigate by dead reckoning or by the use of radio aids to navigation.

*Id.*, Exhibit D, at 1.

> high power events which the civilian operators of UH-1s, and the commercial derivatives, incur during logging and heavy lift operations. Secondly, the long history of operation of the UH-1 aircraft in both combat and peacetime environments did not indicate any accidents of this type. Therefore, notification of U.S. Army aircrews and maintainers was not deemed necessary. The process whereby MABs [Military Alert Bulletins] are reviewed for applicability and appropriate action taken remains in place and has served the aviation community well for many years.[33]

Ralph Vemmer, an aerospace engineer employed by the Army's Aviation and Missile Command, explained the review process for the Military Alert Bulletin:

> The decision was made not to implement this bulletin or the recommendations in this bulletin, because it was the collective opinion within the Aviation Engineering Directorate and the Project Manager's office that the UH-1 helicopter was — utilized in the Army did not fly the type of missions that were cited in the bulletin as causing vertical fin cracking problems. The heavy lifting — heavy lift, high torque lifting type events. And that if we did, they weren't done as frequently as in the commercial arena to cause us to have a problem. Coupled with that was the fact that we had never had, to our knowledge, in reviewing all of the accident data and any database that we could find, that the Army had ever had failure of the vertical fin.[34]

The court concludes that Bell has satisfied the third prong of the *Boyle* test. The Army had the benefit of almost forty years of experience with the UH-1H helicopter, including overhaul and maintenance records, as well as the warnings specific to the vertical fin spar provided by the FAA and Bell. There is no evidence that Bell failed to warn the Army of any dangers that were known to Bell, but not known by the Army. Accordingly, plaintiffs' claims of negligence, wantonness, violation of the Alabama Extended Manufacturer's Liability Doctrine, and breach of warranty are precluded by the government contractor defense, and Bell is entitled to judgment as a matter of law on these claims.

---

[33] Designation of Evidentiary Materials in Support of Motion for Summary Judgment by Bell Helicopter Textron Inc. (doc. no. 22), Exhibit K.

[34] *Id.*, Exhibit P, at 78.

**B.     Failure to Warn**

With respect to "failure to warn" claims, the Eleventh Circuit has held that some aspects of the *Boyle* government contractor defense are applicable.

> On the one hand, the court agrees with the defendant that *Boyle* is not strictly limited to design defect cases. The government contractor defense, for example, could arise when the government prohibits a specific warning. On the other hand, the court agrees with the plaintiff that the three-part test of *McKay* [*v. Rockwell International Corp.*, 704 F.2d 444, 451 (9th Cir. 1983), *cert. denied*, 464 U.S. 1043 (1984)] is necessarily limited to design defect cases. The *Boyle* decision, however, is not rendered completely meaningless in "failure to warn" cases.
>
> To resolve the dilemma of applying *Boyle* to a "failure to warn" case, *Boyle's* two-pronged analysis guides the court.

*Dorse v. Eagle-Picher Industries, Inc.*, 898 F.2d 1487, 1489 (11th Cir. 1990).[35] Applying *Boyle*, the Eleventh Circuit examined whether there was a significant conflict between the state-imposed duty of care (the duty to warn of a danger) and the duty imposed by the government contract (the duty to manufacture and deliver cement containing asbestos), and found that there was no conflict at all. The Eleventh Circuit further observed that the defendant could have complied with both its contractual and state tort law duties. *Id.* at 1490. Accordingly, *Boyle* was not applicable to the failure to warn claims at issue there.

Similarly, in the present action there is no conflict between the state-imposed duty to warn

---

[35]In contrast, other Circuits have modified the three-part *Boyle* test to apply to "failure-to-warn" claims. *See, e.g., Densberger v. United Technologies Corporation*, 283 F.3d 110, 119 n.11 (2d Cir. 2002) ("The three requirements of the *Boyle* test for failure-to-warn cases are: (1) 'government control over the nature of product warnings;' (2) "compliance with the Government's directions;' and (3) 'communication to the Government of all product dangers known to it but not to the Government.'") (citation omitted); *Kerstetter v. Pacific Scientific Company*, 210 F.3d 431, 438 (5th Cir. 2000) ("State law is displaced if (1) the United States exercised discretion and approved the warnings; (2) the contractor provided a warning that conformed to the approved warnings; and (3) contractor warned about the dangers it knew, but the government did not."); *Tate v. Boeing Helicopters*, 140 F.3d 654, 656-57 (6th Cir. 1998) (state law is displaced when the contractor shows: "(1) the United States exercised its discretion and approved the warnings, if any; (2) the contractor provided warnings that conformed to the approved warnings; and (3) the contractor warned the United States of the dangers in the equipment's use about which the contractor knew, but the United States did not.").

of the danger and the contractual duty for Bell to produce and deliver helicopters to the Army.

Plaintiffs contend that the warnings Bell gave to the Army were *inadequate*, because: they focused on the problems associated with heavy lift operations and high torque events in the commercial versions of the UH-1H; Bell failed to warn the Army about vertical fin failures that had caused crashes of the civilian equivalent of the UH-1H; and, that Bell failed to warn the Army that the design of the vertical fin spar was inadequate. Under Alabama law,

> [a] negligent failure-to-adequately-warn case cannot be submitted to a jury unless there is some evidence that the allegedly inadequate warning would have been read and heeded and would have kept the accident from occurring.
> ...
>
> Where a warning is necessary, the warning need only be one that is reasonable under the circumstances and it need not be the best possible warning. There is no duty to warn of every potential danger or to explain the scientific rationale for each warning, but only a duty to warn of those dangers which the owner or user would not be aware of under the particular circumstances of his use of the product in question.

*Gurley v. American Honda Motor Company, Inc.*, 505 So. 2d 358, 361 (1987) (citations omitted).

Basically, plaintiffs contend that the Army was not sufficiently warned of the "seriousness" of the problems with the vertical fin spar, as evidenced by the Army's failure to implement either the FAA's or Bell's enhanced inspection requirements, or otherwise take preventive measures. As set forth in section A.3. above, there is no question that the Army was aware of problems with the vertical fin spar. The FAA specifically states that the "Airworthiness Directive" mandating enhanced inspection procedures was prompted by "two accidents involving in-flight failures of the tailboom vertical fin spars."[36] The "Military Alert Bulletin" issued by Bell calls for *immediate* inspection of the tailboom fin spar upon receipt of the bulletin, and each eight flight hours

---

[36]Designation of Evidentiary Materials in Support of Motion for Summary Judgment by Bell Helicopter Textron Inc. (doc. no. 22), Exhibit I, at 1.

thereafter.[37] Again, the Army had not experienced the cited problems with the vertical fin spar during its extensive experience with the aircraft.

The Army also was aware, prior to the issuance of Bell's Military Alert Bulletin, of a crash of a UH-1H helicopter sold as surplus or donated to the Colombian army, due to a vertical fin spar failure.[38] Stephen D. Monaco, an aerospace engineer in the Army's Department of Aviation Engineering, stated that reports of the accident investigation were reviewed, as well as the maintenance procedures used by the Colombian army. Based on that information, and the manner in which the aircraft was flown — *i.e.,* "in a much more rigorous manner and at much heavier gross weights and ... near the ragged edge of speed"[39] — the Army determined that further action was not warranted.

There is no evidence that Bell withheld knowledge from the Army about problems with the vertical fin spar, or that the Army otherwise was not aware of such problems. Moreover, Bell had no separate duty to warn UH-1H helicopter pilots, such as plaintiff Francis Mark Crawford. *See Purvis v. PPG Industries, Inc.,* 502 So. 2d 714, 720 (Ala. 1987) ("A manufacturer is not liable if it has made reasonable efforts to convey product information and/or warnings that, because of circumstances beyond its control, were not passed on to or were not received by, the ultimate user."). Accordingly, the court concludes that plaintiffs' failure-to-warn claim must fail.

## II. CONCLUSION

For the foregoing reasons, the court concludes that Bell's motion for summary judgment is

---

[37]*Id.*, Exhibit J, at 1.

[38]Plaintiffs' Submission of Evidentiary Materials in Support of Brief in Opposition to Motion for Summary Judgment by Bell (doc. no. 31), Exhibit 1, at 36-37.

[39]Designation of Evidentiary Materials in Support of Motion for Summary Judgment by Bell Helicopter Textron Inc. (doc. no. 22), Exhibit T, at 39.

due to be granted. A separate order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this **28th** day of May, 2002.

_____
United States District Judge