UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED

02 MAY 28 PM 3 0

N D OF ALABAMA

FRANCIS MARK CRAWFORD and )
BECKY CRAWFORD,                    )
                                            )
        Plaintiffs,                   )
                                            )
vs.                                       )        Civil Action No. CV-99-S-2041-S
                                            )
BELL HELICOPTER/TEXTRON; and )
DYNCORP,                            )
                                            )
        Defendants.                 )

ENTERED

MAY 2 8 2002

### MEMORANDUM OPINION

Plaintiffs, Francis Mark Crawford and his wife, Becky Crawford, assert various tort claims against defendant DynCorp, Inc. ("DynCorp") arising from a helicopter crash that occurred on May 1, 1999. The action presently is before the court on DynCorp's motions for summary judgment (doc. no. 26) and to strike certain portions of the affidavits of B.J. Sammons and Richard McSwain and the deposition testimony of Steve Powell, and certain documents and evidentiary submissions in support thereof (doc. no. 50).

Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322, 106 S.Ct.



2548, 2553, 91 L.Ed.2d 265 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.

> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)) (internal quotation marks and citations omitted); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).

Plaintiff Francis Mark Crawford is a civilian employee of the United States Army who was injured in a crash of a Bell Helicopter/Textron ("Bell") UH-1H helicopter in Shelby County, Alabama, on May 1, 1999. The helicopter's vertical fin separated from the fuselage, causing the aircraft to crash.

Following the accident, the helicopter's tailboom and vertical spar were examined by representatives of the Army's Analytical Investigation Branch and Bell's Field Investigations group at the Corpus Christi, Texas Army Depot. The Army's Analytical Investigation Branch concluded that "[t]he fin spar, P/N 205-030-846- (All Dash Numbers) failed from fatigue, originating in a rivet hole identified (by Bell convention) as 'number 2.' No obvious material deficiencies were noted."[1] Bell's investigators also found fatigue fractures, but did not find any metallurgical irregularities.[2]

The helicopter involved in the crash was manufactured by Bell for the United States Department of the Army pursuant to contract number DAA J01-71-C-0319 (P2B), executed on

---

[1]Designation of Evidentiary Materials in Support of Motion for Summary Judgment by Bell Helicopter Textron Inc. (doc. no. 22), Exhibit A, at 2.

[2]*Id.*

January 8, 1971.  The helicopter was assigned serial number 71-20228, and it was accepted by the

Army as conforming to the contract on September 11, 1972.[3]  The tailboom and vertical fin spar on

the accident helicopter had been replaced with spare parts that originally were installed on another

helicopter produced under the same contract, and assigned serial number 71-20117.[4]  That helicopter

had been accepted by the Army as conforming to the contract on May 27, 1972.[5]  The accident

helicopter was redesignated a UH-1V[6] on October 29, 1980, and, at the time of the accident, was

being used as a medical transport helicopter.

The United States Department of the Army and defendant DynCorp executed Aircraft

Maintenance Contract DABTO1-98-C-0014 on September 24, 1998.  The terms of that contract

obligated DynCorp to maintain all Army aircraft located at Fort Rucker, Alabama, including UH-1H

helicopters.  The scope of work to be performed was described in the contract as follows:

> The contractor shall furnish all personnel, management, materials, parts, supplies,
> transportation, and equipment, except as provided herein as Government furnished,
> to perform all aviation unit (AVUM), aviation intermediate (AVIM), and limited
> depot maintenance of all assigned rotary wing aircraft (with organic equipment) and
> all aviation associated equipment for the United States Army Aviation Center
> (USAAVNC), Fort Rucker, Alabama, all locations for which USAAVNC
> subsequently becomes responsible for aircraft maintenance (these will be negotiated
> as necessary), USAAVNC satellite activities, and the U.S. Army Technical Test
> Center (ATTC). The Contractor shall perform also all AVUM, AVIM, and limited
> depot repairs of aircraft components at Fort Rucker to include locally manufacturing
> of parts, tools, and kits as directed by the U.S. Government.  Contractor performance
> shall be in accordance with this PWS and the technical exhibits.[7]

Moreover, DynCorp was charged with determining the airworthiness of the aircraft "as required by

---

[3]*Id.*, Exhibit G.

[4]*Id.*, Exhibit N, at 47.  It is not clear from the records when the tailboom assembly was replaced.  *See* Bell Exhibit E.

[5]*Id.*, Exhibit H.

[6]The helicopter was redesignated as a UH-1V for medical evacuation.

[7]Plaintiffs' Submission of Evidentiary Materials in Support of Brief in Opposition to Motion for Summary Judgment by DynCorp (doc. no. 30), Exhibit 9, Tab K.

applicable regulations and publications. Such determination shall be based on inspection, maintenance operational checks, and test flying as required by applicable Army publications and directives."[8] DynCorp inspects and maintains the UH-1H helicopters in accordance with the following United States Department of the Army Technical Manuals: "Aviation Unit and Intermediate Maintenance Instructions — Army Model UH-1H/V/EH-1H/X," TM-1520-210-23-1; "Preventive Maintenance Daily," TM 1-1520-210-PMD; and, "UH-1H/V and EH-1H/X Aircraft Phased Maintenance[9] Checklist," TM 55-1520-210-PM.[10]

DynCorp has no authority to deviate from the inspection and maintenance standards established by the Army.[11] On the other hand, according to David Thill, DynCorp's Director of Safety at Fort Rucker, "Army personnel review DynCorp's maintenance and inspection procedures on a daily basis to ensure that Army standards are met":

> The Army has a contracting officer at Fort Rucker, Alabama, whose function is to ensure that DynCorp properly performs its responsibility under the Contract. The Contracting Officer's representative is the Chief of the Aviation Logistics Management Division (ALMD), whose office is in the same building as DynCorp's offices at Fort Rucker.
>
> To ensure that DynCorp is properly performing its duties under the contract, there is an Army Officer in Charge at each Fort Rucker base field who reports to the Chief of ALMD. Each Officer in Charge has several non-commissioned officers who report to him or her. These Army personnel review DynCorp's maintenance and inspection procedures on a daily basis to ensure that Army standards are met. This review includes, among other things, spot checks of the condition of each aircraft, the

---

[8]*Id.*, at Tab L.

[9]The phased maintenance inspection checklist "contains requirements for inspection of the UH-1H/V and EH-1H/X aircraft on phased schedule having a 900 hour (flight hours) cycle with 150 hour phases. Each requirement included herein is designated for accomplishment at least once, but not more than six times during the 900 hour cycle." Evidentiary Submission to DynCorp's Brief in Support of Motion for Summary Judgment (doc. no. 25), Exhibit H, Technical Manual, "UH-1H/V and EH-1H/X Aircraft Phased Maintenance Checklist," at 1-2.

[10]Evidentiary Submission to DynCorp's Brief in Support of Motion for Summary Judgment (doc. no. 25), Exhibit H.

[11]*Id.*, Exhibit G, at 2 (paragraph numbers omitted).

settling of disputes between pilots and maintenance personnel, ensuring that DynCorp properly inspects and maintains all aircraft, and ensuring that all actions are properly documented.[12]

The Federal Aviation Administration issued a "Priority Letter Airworthiness Directive" on September 17, 1997, reading in pertinent part as follows:

> This priority letter Airworthiness Directive (AD) is prompted by two accidents involving in-flight failures of the tailboom vertical fin spars (vertical fin spars) on Model TH-1L and UH-1B helicopters. One other accident occurred on a Model 205A-1 helicopter which is of similar type design. One of the accidents resulted in a fatality. As a result of these accident investigations, the FAA has determined that a large number of high-power events can cause fatigue cracks which will cause the vertical fin spar to fail. This condition, if not corrected, could result in in-flight failure of the vertical fin spar and subsequent loss of control of the helicopter.
>
> Since an unsafe condition has been identified that is likely to exist or develop on other Bell-manufactured Model ... UH-1H ... helicopters of the same type design, this priority letter AD requires, within 8 hours time-in-service (TIS) after the effective date of this AD, modification and inspection of the vertical fin spar. Then, at intervals not to exceed 8 hours TIS, further inspections of the vertical fin spar for cracks are required. If any crack is discovered, replacement of the vertical fin spar with an airworthy vertical fin spar is required before further flight.[13]

The directive, with which civilian operators were required to comply, mandated certain inspections and modifications (to facilitate inspection) of the helicopter's vertical fin spar. Those inspections were to be accomplished within eight hours time-in-service after receipt of the directive, and at eight-hour time-in-service intervals thereafter.

The Army, although not obligated to comply with the FAA's Airworthiness Directives,[14] reviews them to determine their applicability to the military fleet. Following review of the directive, the Army decided not to implement its requirements, based on the Army's extensive experience with

---

[12]*Id.*

[13]Designation of Evidentiary Materials in Support of Motion for Summary Judgment by Bell Helicopter Textron Inc. (doc. no. 22), Exhibit I, at 1.

[14]*Id.,* Exhibit P, at 88.

5

the aircraft (and no history of such problems), and because the helicopters were not regularly used by the Army for heavy lifting, or "high power events."[15]

Bell issued a "Military Alert Bulletin" on April 6, 1998, applicable to the UH-1H model helicopter. The Bulletin stated: "Cracks have been found on the tail boom vertical fin spar. The fatigue cracks originated from the rivet holes in the area of fin station 60 to 75. Loose rivets, debond of the doublers and corrosion contributed to cracking of the spar."[16] The Bulletin prescribed inspection procedures to be completed upon receipt of the bulletin. In particular, the Bulletin required visual inspection, "tap hammer" inspection, and fluorescent penetrant inspection. Visual inspection was to be repeated each eight flight hours thereafter, and "tap hammer" and fluorescent penetrant inspections were to be repeated 180 days after the initial inspection.

Again, the Army reviewed the warning and decided against implementation of the recommended course of action, based on the same factors it had reviewed in connection with the FAA Airworthiness Directive. Specifically, in a letter addressed to Representative Terry Everett, dated June 25, 1999, Daniel J. Rubery, Deputy to the Commanding General of the Army's Aviation and Missile Command, explained:

First, the U.S. Army UH-1H/V flight spectrum[17] did not involve a high number of

---

[15]*Id.* at 94.

[16]*Id.,* Exhibit J, at 1.

[17]The original "mission" for the UH-1H utility helicopter was described in the March 2, 1970 specification as follows:

> The mission of this aircraft shall be to transport personnel; special teams or crews; equipment and supplies; medical evaluation; ambulance service from the battlefield to a medical installation and emergency ambulance service between two medical installations where facilities for fixed-wing aircraft are not available; to deliver protective fire by attachment of appropriate weapons; and as an instrument trainer. This aircraft shall be capable of performing these missions from prepared or unprepared takeoff or landing areas, under instrument operations, light icing conditions, day or night flying and to navigate by dead reckoning or by the use of radio aids to navigation.

high power events which the civilian operators of UH-1s, and the commercial derivatives, incur during logging and heavy lift operations. Secondly, the long history of operation of the UH-1 aircraft in both combat and peacetime environments did not indicate any accidents of this type. Therefore, notification of U.S. Army aircrews and maintainers was not deemed necessary. The process whereby MABs [Military Alert Bulletins] are reviewed for applicability and appropriate action taken remains in place and has served the aviation community well for many years.[18]

Ralph Vemmer, an aerospace engineer employed by the Army's Aviation and Missile Command, explained the review process for the Military Alert Bulletin:

The decision was made not to implement this bulletin or the recommendations in this bulletin, because it was the collective opinion within the Aviation Engineering Directorate and the Project Manager's office that the UH-1 helicopter was — utilized in the Army did not fly the type of missions that were cited in the bulletin as causing vertical fin cracking problems. The heavy lifting — heavy lift, high torque lifting type events. And that if we did, they weren't done as frequently as in the commercial arena to cause us to have a problem. Coupled with that was the fact that we had never had, to our knowledge, in reviewing all of the accident data and any database that we could find, that the Army had ever had failure of the vertical fin.[19]

Following the accident that led to this suit, the Army grounded its UH-1H fleet pending formulation and implementation of requirements for returning the aircraft to service.[20] The Army issued an emergency "Technical Bulletin," entitled "Mandatory Initial and Recurring Inspection of Tail Boom Vertical Fin Spar Assembly for All UH-1 Series Aircraft," on June 9, 1999.[21] This bulletin specified the enhanced inspection procedures required to be performed, including an initial x-ray inspection of the vertical fin spar, to be repeated each 75 flight hours; an initial tap hammer

---

Id., Exhibit D, at 1.

[18]Designation of Evidentiary Materials in Support of Motion for Summary Judgment by Bell Helicopter Textron Inc. (doc. no. 22), Exhibit K.

[19]Id., Exhibit P, at 78.

[20]Plaintiffs' Submission of Evidentiary Materials in Support of Brief in Opposition to Motion for Summary Judgment by Bell (doc. no. 31), Exhibit 68.

[21]Evidentiary Submission to DynCorp's Brief in Support of Motion for Summary Judgment (doc. no. 25), Exhibit Q.

inspection,[22] to be repeated during each phase inspection; and visual inspection of the spar using a magnifying glass, to be performed upon receipt of the bulletin, and repeated after the last flight of each day.

During performance of the required inspections, several helicopters located at Ft. Rucker were found to have vertical fin spar cracks. Those cracks were detected only upon x-ray inspection, however, and were not detectable upon visual inspection.[23]

Forrest Holcomb, DynCorp's Quality Control Foreman, stated that his review of the maintenance records of the accident helicopter indicates that inspections were made in accordance with Army standards, and that no cracks were visible "utilizing the Army inspection criteria in place prior to the crash."[24] Holcomb further stated that, to his knowledge, no fatigue cracks had ever been discovered by maintenance personnel at the field or intermediate maintenance level using the pre-accident maintenance criteria.[25]

James W. Snellgrove, the Army's Contracting Officer, was responsible for the award and administration of the DynCorp maintenance contract. He stated that the contract incorporated a "Quality Assurance Evaluator's Surveillance Plan" to enable the Army to monitor DynCorp's compliance with the contract. He further stated that he was "unaware of any finding that the DynCorp inspection of vertical tail fins did not comply with contract requirements."[26]

---

[22]A "tap hammer" inspection is described in the Military Alert Bulletin as follows: "Inspect by lightly tapping on the surface of the part. The number of taps per minute shall be such as to produce a continuous sound so that any differences in sound tone can be readily detected. The rate of tapping will vary, depending on the material and construction of the assembly." *Id.*, Exhibit L, at 3.

[23]Supplement to DynCorp's Designation of Evidentiary Materials in Support of Motion for Summary Judgment (doc. no. 51), Exhibit X.

[24]Evidentiary Submission to DynCorp's Brief in Support of Motion for Summary Judgment (doc. no. 25), Exhibit H, at 3.

[25]*Id.*

[26]Supplement to DynCorp's Designation of Evidentiary Materials in Support of Motion for Summary Judgment

Upon consideration of the pleadings, briefs, and evidentiary submissions, the court concludes

DynCorp's motion for summary judgment is due to be granted.

## I. DISCUSSION

### A.    Motion to Strike

DynCorp asks the court to strike portions of the affidavits of B.J. Sammons and Richard

McSwain, and the deposition testimony of Steve Powell.

Federal Rule of Evidence 702 governs the admissibility of testimony by experts, and

provides:

> If scientific, technical, or other specialized knowledge will assist the trier of
> fact to understand the evidence or to determine a fact in issue, a witness qualified as
> an expert by knowledge, skill, experience, training, or education, may testify thereto
> in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient
> facts or data, (2) the testimony is the product of reliable principles and methods, and
> (3) the witness has applied the principles and methods reliably to the facts of the
> case.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469

(1993), the Supreme Court emphasized the court's "gatekeeping" role, stating that Rule 702[27]

"assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable

foundation and is relevant to the task at hand." *Id.* at 597, 113 S.Ct. at 2799.  The Court in *Kumho*

*Tire Company, Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), made

clear that the court's gatekeeping obligation is not limited to scientific testimony, but extends to all

---

(doc. no. 51), Exhibit S.

[27]Rule 702 was amended effective December 1, 2000, in response to the Supreme Court's decisions in *Daubert
v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Kumho Tire
Company, Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).  The version of Rule 702 in effect
at the time of those decisions read as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the
> evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill,
> experience, training, or education, may testify thereto in the form of an opinion or otherwise.

expert testimony. *Id.* at 147, 119 S.Ct. at 1174.

To aid courts in assessing the reliability of the proffered testimony, the Supreme Court identified factors that may be considered: whether the expert's technique or theory can be or has been tested; whether the technique or theory has been published or subject to peer review; the known or potential rate of error; the existence or maintenance of standards of control; and, whether the theory or technique is generally accepted in the scientific community. *Daubert,* 509 U.S. 593-94, 113 S.Ct. 2797. In *Kumho Tire,* the Court opined that those factors also may be applicable to determine the reliability of proffered non-scientific expert testimony. *Kumho Tire,* 526 U.S. at 152, 119 S.Ct. at 1176.

Federal Rule of Evidence 703 governs the permissible bases of expert opinion testimony, and reads, in pertinent part, as follows:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.

"[A] party may not avoid summary judgment solely on the basis of an expert's opinion that fails to provide specific facts from the record to support its conclusory allegations." *Evers v. General Motors Corp.,* 770 F.2d 984, 985 (11th Cir. 1985). "Without an underlying basis of support, the 'expert's' opinion is only one of many possible theories and interpretations of the facts at issue, and is no more or less helpful than the trier of fact's own reading of the evidence." *Browder v. General Motors Corp.,* 5 F. Supp. 2d 1267, 1283 (M.D. Ala. 1998).

### 1.    Affidavit of B.J. Sammons

B.J. Sammons' affidavit recites that he is experienced in the maintenance of UH-1H

10

helicopters, based on his employment at Fort Rucker from the late 1950s until his retirement on April 30, 1999. When he retired, he was the lead mechanic on Army aircraft at Flat Iron at Cairns Field at Fort Rucker. He states that he is "familiar with all maintenance protocol involving the UH-1."[28]

DynCorp seeks to exclude several portions of Sammons' affidavit because his area of expertise is limited, and there is no basis in fact for some of his conclusions about the condition of the vertical fin spar on the accident helicopter. Plaintiff concedes that the following statements contained in Sammons' affidavit may be excluded:

1.   The last sentence of the third paragraph: "I am personally familiar with the accident report and the metallurgical report involving the vertical fin on the subject aircraft and, it is evident that the fatigue fractures were there on the date of the corrosion control inspection (the day before the accident)."

2.   The third sentence of the fourth paragraph: "I am of the opinion that the cracks existed on the subject helicopter during the time of the October, 1998, phase inspection."

3.   The sixth paragraph in its entirety.

4.   The first and last sentences of the seventh paragraph.

5.   The last sentence of the ninth paragraph: "This is a strong indication that the aircraft was subject to inferior maintenance in violation of the government contract with the U.S. Army."

6.   The tenth paragraph, except for the second sentence.[29]

The court agrees that certain additional portions of Sammons' affidavit are due to be stricken. Specifically, the penultimate sentence in the fourth paragraph ("The cracks existed in the vertical fin on this date [*i.e.*, the date during October 1998 on which the phase inspection was performed] and

---

[28]DynCorp's Motion to Strike (doc. no. 50), Exhibit A.

[29]*See* Plaintiffs' Response to DynCorp's Motion to Strike (doc. no. 52), at 7-8.

these cracks would have been discovered during this inspection if the line mechanics had received proper guidance from DynCorp management") will be excluded. Plaintiffs have already conceded that Sammons is not qualified to express an opinion as to whether the cracks were present on the accident helicopter's vertical fin spar at the time the phase inspection was performed. Accordingly, his view that the cracks would have been discovered during the phase inspection "amounts to no more than a mere guess or speculation" and should be excluded. *United States v. 0.161 Acres of Land*, 837 F.2d 1036, 1040 (11th Cir. 1988).

The eighth paragraph, which reads as follows, is due to be stricken in its entirety:

I have reviewed the deposition testimony of the Bell metallurgical field investigator, Mr. Steve Powell, who investigated the cracks on the subject helicopter and I am in agreement with him that the cracks in the vertical fin were present for a long period of time. These cracks were visible and they were detectable the day before the crash during the corrosion control inspection. It was the responsibility of the maintainer of the aircraft to detect and repair this dangerous condition. The failure of DynCorp to detect these cracks was in direct violation and breach of their contract with the Army.

Sammons' expertise is in the maintenance and inspection of UH-1H helicopters, and he is not qualified to express an opinion relating to the metallurgical examination of the accident parts. Moreover, there is no factual basis for his statement that the cracks were visible and detectable prior to the crash. Additionally, Sammons is not qualified to interpret the contract between DynCorp and the Army.

### 2.    Affidavit of Richard McSwain, Ph.D.

Richard McSwain, Ph.D., is a materials engineer with experience in materials failure analysis. He reviewed and based his conclusions upon the following documents: the reports of the accident investigations conducted by Bell and the Army; the maintenance records; Bell's Report No.

12

20599M-164, UH-1 fin spar crack propagation test results,[30] dated October 26, 1999; and Bell's "Military Alert Bulletin," issued April 6, 1998.

DynCorp seeks to exclude paragraphs five through seven of the affidavit, contending that, because those paragraphs do no more than restate the conclusions of Bell and the Army, they are not helpful to the trier of fact's understanding of the evidence. The court finds this argument to be without merit. McSwain's statements in those paragraph provide background and context for his conclusions in subsequent paragraphs.

DynCorp also has requested that the court strike the final portion of paragraph eight, which reads in its entirety: "The subject crash occurred on May 1, 1999 with 112 flight hours accumulated since the last inspection reportedly performed in November 1998." Plaintiff concedes that the word "last" should be stricken. Accordingly, DynCorp's motion to strike is granted in that respect.

DynCorp asserts that paragraphs nine and ten, which read as follows, should be stricken:

9.      The propagation of a fatigue fracture of approximately 1.25 inch (the approximate size of the crack in the subject aircraft) would require approximately 450 flight hours, based on an extrapolation of the test data obtained by Bell in their crack propagation test.

10.     Based on review of the Bell Helicopter Textron spar crack propagation test results, the fatigue crack would have been present and detectable at the inspection performed 112 hours prior to the accident event.

DynCorp contends that both paragraphs should be stricken because plaintiffs have failed to establish the relevance of Bell's Report No. 20599M-164, UH-1 Fin Spar Crack Propagation Test Results, dated October 26, 1999. DynCorp asserts that the propagation test on which the report was based

---

[30]*See* Plaintiffs' Submission of Evidentiary Materials in Support of Brief in Opposition to Motion for Summary Judgment by DynCorp (doc. no. 30), Exhibit 129. Bell's Engineering Laboratories performed testing on a tailboom received from the Army, which had 10,214 recorded flight hours. The purpose of the testing was "to verify and/or extend the inspection interval." *Id.*

was performed on a different model tailboom than that of the accident tailboom. Plaintiffs argue that there are no differences between the tailboom that are relevant to crack propagation. The test tailboom was numbered 205-032-800-101, and the accident tailboom was numbered 205-032-800-071. Plaintiffs explain that the engineering drawings indicate the part numbers, and that the part number for the vertical fin assembly is "032."[31] Plaintiffs have provided Army documentation demonstrating that the tailboom assembly may be used on both UH-1H and UH-1V helicopters.[32] Thus, plaintiffs argue that DynCorp has not shown any meaningful difference between the test tailboom and the accident tailboom. The court finds plaintiffs' arguments persuasive. Accordingly, the data contained in Bell's report on crack propagation for a UH-1H helicopter may be used to extrapolate data on crack propagation for a UH-1V helicopter.

DynCorp also takes issue with McSwain's conclusion in paragraph ten that the cracks were "present and detectable," asserting that McSwain failed to specify by which means the cracks were detectable — *i.e.*, whether by visual inspection, x-ray, tap hammer test, dye penetrant test, or any other means. Plaintiffs have submitted a second affidavit, dated November 13, 2000, in which McSwain states "[i]n using the word 'detectable' I meant that the cracks were visible to the naked eye and also would have been detectable by the use of non-destructive testing."[33] The court concludes that the affidavits do not provide a factual basis for McSwain's conclusion that the cracks were "visible to the naked eye." McSwain is qualified, however, to express an opinion as to whether the cracks could be detected through non-destructive testing. Accordingly, DynCorp's motion to

---

[31]The record contains evidence that the first three numerical sequences of the part number specify the part's design characteristics. *See, e.g.*, Evidentiary Submission to DynCorp's Brief in Support of Motion for Summary Judgment (doc. no. 25), Exhibit K.

[32]Plaintiffs' Response to DynCorp's Motion to Strike (doc. no. 52), Exhibit C.

[33]*Id.*, Exhibit D.

14

strike is due to be granted in part.

### 3.    Deposition of Steve Powell

Steve Powell has worked for Bell's Field Investigation Group since 1970, and he conducted a microscopic examination of the accident parts on Bell's behalf.[34]  Generally, Powell's job duties entailed operating a transmission electron microscope to take photographs of fractured parts, and reporting his findings to a metallurgist.  Powell also performed, as part of his job duties, "striation counting," a method used to determine the rate of growth of a crack.  Notably, however, Powell did *not* perform striation counting on the *accident parts* he examined.[35]

DynCorp contends that Powell is not qualified to testify that the fatigue cracks in the vertical fin spar would have been visible prior to the accident.  Specifically, DynCorp contends that his opinions exceed his expertise because "(1) there is no evidence indicating he had any training or expertise in determining what was or was not visible in the past; (2) he has no metallurgical experience; and (3) he does not know whether the cracks were visible or not visible under inspection criteria of the Army prior to the crash."[36]

The court has reviewed Powell's deposition testimony, and concludes that his testimony relating to the visibility of the crack is due to be stricken.  Powell testified that he had not seen the accident helicopter prior to the crash, and that he was not familiar with the Army's inspection criteria.  When asked "whether [the cracks] were visible or not visible under the inspection criteria of the Army," Powell replied that he did not know.[37]  Accordingly, Powell's testimony relating to

---

[34]*Id.*, Exhibit E, at 10.

[35]*Id.*, at 35.

[36]DynCorp Motion to Strike (doc. no. 50), at 14.

[37]Plaintiffs' Response to DynCorp's Motion to Strike (doc. no. 52), Exhibit E, at 39.

whether the cracks could have been detected upon visual inspection of the aircraft is due to be stricken.

### 4.    Exhibit 115[38]

The exhibit at issue is a drawing of a tailboom installation, containing the handwritten notations "Patched area center spar" and "cracked skin should have been visible 1 to 2 [inches] above tailcone cover." DynCorp asserts that the handwritten notes have not been authenticated, and that their relevance has not been established, since the drawing does not indicate when the cracked skin allegedly would have been visible. Plaintiffs assert that the challenged document is a business record, that the notations appear to have been made based upon personal knowledge, and that Powell referred to the document during his deposition. Upon review of Powell's deposition, however, it appears that the document to which he refers as Exhibit 114 is his report, and not the drawing at issue. The court agrees with DynCorp that the drawing should be stricken, as there is no foundation for the opinion expressed therein. Moreover, assuming the notation was made by Powell, the portion of his testimony relating to the visibility of the cracks prior to the accident has been stricken.

### B.    Motion for Summary Judgment

Plaintiffs have conceded that DynCorp is entitled to the entry of summary judgment on their claims based on the Alabama Extended Manufacturers Liability Doctrine and for breach of warranty. DynCorp asserts that it is entitled to summary judgment on the remaining claims, based on the "government contractor defense."

### 1.    Government Contractor Defense

This court must determine whether the government contractor defense enunciated by the

---

[38]The exhibit is identified in the pleadings as "Exhibit 114," but the correct exhibit number is 115. *See* DynCorp's reply to Plaintiff's Response to DynCorp's Motion to Strike (doc. no. 53), at 11 n.2.

Supreme Court in *Boyle v. United Technologies Corp.*, 487 U.S. 500, 108 S.Ct. 2510, 101 L.Ed.2d

442 (1988), applies to DynCorp's performance of its maintenance contract with the United States

Department of the Army. *Boyle* required the Supreme Court "to decide when a contractor providing

military *equipment* to the Federal Government can be held liable under state tort law for injury

caused by *a design defect*." *Id.* at 502, 108 S.Ct. at 2513 (emphasis supplied). In examining this

issue, the *Boyle* Court reasoned that the liability of an independent contractor performing its

obligation under a military equipment *procurement contract* implicates "uniquely federal" interests

similar to those implicated by the civil liability of federal officials for actions taken in the scope of

their duty, and is therefore governed by federal law. *Id.* at 505-06, 108 S.Ct. at 2515.[39] The Court

held that where imposing liability on government contractors would create a "'significant conflict'

between federal interests and state law," state law must be displaced. *Id.* at 507, 108 S.Ct. at 2518.

The Court focused on the "discretionary function" exception to the Federal Tort Claims Act,

28 U.S.C. § 2680(a),[40] stating:

> We think that the selection of the appropriate design for military equipment
> to be used by our Armed Forces is assuredly a discretionary function within the
> meaning of this provision. It often involves not merely engineering analysis but
> judgment as to the balancing of many technical, military, and even social
> considerations, including specifically the trade-off between greater safety and greater
> combat effectiveness. And we are further of the view that permitting "second-
> guessing" of these judgments through state tort suits against contractors would
> produce the same effect sought to be avoided by the FTCA exemption. The financial
> burden of judgments against the contractors would ultimately be passed through,
> substantially if not totally, to the United States itself, since defense contractors will

---

[39]For example, the *Boyle* Court observed that "[t]he imposition of liability on Government contractors will directly affect the terms of Government contracts: either the contractor will decline to manufacture the design specified by the Government, or it will raise its price. Either way, the interests of United States will be directly affected." *Boyle,* 487 U.S. at 507, 108 S.Ct. at 2515-16.

[40]28 U.S.C. § 2680(a) provides an exception to the United States' consent to suit for the negligent or wrongful conduct of federal employees for "[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

> predictably raise their prices to cover, or to insure against, contingent liability for the Government-ordered designs.  . . .  In sum, we are of the view that state law which holds Government contractors liable for design defects in military equipment does in some circumstances present a "significant conflict" with federal policy and must be displaced.

*Id.* at 511-12, 108 S.Ct. at 2518 (citation and footnote omitted).

The *Boyle* Court ultimately adopted the three-part test formulated by the Ninth Circuit in *McKay v. Rockwell International Corp.*, 704 F.2d 444, 451 (9th Cir. 1983): *i.e.*, liability for design defects in military equipment cannot be imposed upon Government contractors under state tort law when "(1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512, 108 S.Ct. at 2518.  The Court observed that the first two factors "assure that the suit is within the area where the policy of the 'discretionary function' would be frustrated," and that the third factor was "necessary because, in its absence, the displacement of state tort law would create some incentive for the manufacturer to withhold knowledge of risks, since conveying that knowledge might disrupt the contract but withholding it would produce no liability." *Id.*, 108 S.Ct. at 2518-19.

Although no Circuit has yet directly addressed the applicability of the government contractor defense to service or performance contracts, a few district courts have applied *Boyle* to such contracts.  *See Guillory v. Ree's Services,* Inc., 872 F. Supp. 344, 346 (S.D. Miss. 1994) (all government contractors may assert the defense); *Richland-Lexington Airport District v. Atlas Properties, Inc.*, 854 F. Supp. 400, 423 (D. S.C. 1994) (*Boyle* applies to non-military performance contracts); *Lamb v. Martin Marietta Energy Systems, Inc.*, 835 F. Supp. 959, 966 n.7 (W.D. Ky. 1993) (finding no reason to limit *Boyle* to procurement contracts); *Crawford v. National Lead Co.*,

18

784 F. Supp. 439, 445 n.7 (S.D. Ohio 1989) (holding that government contractor defense is viable with regard to performance contracts).

The Eleventh Circuit's only pronouncement on the applicability of *Boyle* outside the military procurement context is found in *Dorse v. Eagle-Picher Industries, Inc.*, 898 F.2d 1487 (11th Cir. 1990), where the Court commented that "*Boyle* is not strictly limited to design defect cases," but then added that *Boyle's* three-part test "is necessarily limited to" such cases. *Id.* at 1489.

Another district court within this Circuit has held that the so-called "government agency defense," as opposed to the" government contractor defense," applied to government service or performance contracts. *Amtreco, Inc. v. O.H. Materials, Inc.*, 802 F. Supp. 443, 445 (M.D. Ga. 1992). The court based its conclusion on the *Boyle* Court's reliance on *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18, 60 S.Ct. 413, 84 L.Ed. 554 (1940), and the Eleventh Circuit's statement about the defense in *Shaw v. Grumman Aerospace Corp.*, 778 F.2d 736 (11th Cir. 1985).

In *Yearsley,* the Supreme Court held that a government contractor could not be held liable under state law for the erosion caused by its work in constructing dikes for the government, saying "if this authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will." *Yearsley*, 309 U.S. at 20-21, 60 S.Ct. at 414.

In *Shaw*, a design defect case pre-dating *Boyle*, the Eleventh Circuit — after observing that the Supreme Court had not yet addressed the issue of military contractor immunity for product design defects — reviewed the "military contractor defense," the "government agency defense," and the "contract specifications defense," which it viewed as three separate theories. With respect to the "government agency defense," which was not at issue in the case, the Court of Appeals stated:

This defense is rarely invoked, and its elements are nowhere clearly stated. To evaluate a *Yearsley* claim in the military contractor context, a court would appear to be obliged to take three steps. First, it would apply the *Feres* doctrine to determine whether the government itself could be sued in that situation. If not, the court would then invoke a second body of doctrine, the law of principal and agent, to inquire whether the contractor actually acted as an agent of the government. Precedent in this Court makes it clear that, at least in manufacturing defect cases arising in a military setting, a firm must be more than simply an independent contractor to be regarded as the government's agent. In *Whitaker v. Harvell-Kilgore Corp.*, 418 F.2d 1010, 1013-1015 (5th Cir. 1969), the former Fifth Circuit rejected the sovereign immunity claim of such a contractor that manufactured a defective grenade. Finally, if the contractor proved agency status, the court would inquire whether the agent acted within the course and scope of its duties.

*Shaw*, 778 F.2d at 740. The district court in *Amtreco* adopted this test, and concluded that the contractor had not established the elements of the defense.

This court concludes, however, that the better approach is to apply *Boyle* to contracts involving the performance of services for the government. *See, e.g., Richland-Lexington Airport District*, 854 F. Supp. at 422 ("The dispositive issue is not one of performance versus procurement, but whether there is a uniquely federal interest in the subject matter of the contract.") Particularly here, where the service provided by DynCorp was the inspection and maintenance of military equipment, *Boyle's* rationale is apt. *Boyle* rested on the "discretionary function" exception to the Federal Tort Claims Act, and raised concerns that state tort law could, in certain circumstances, frustrate an identifiable federal interest or policy, such that state law should be displaced. Those same concerns are present regardless of whether the contract is one for services or for procurement. *See Boyle*, 487 U.S. at 506 ("The federal interest justifying [the Court's holding in *Yearsley*] surely exists as much in procurement contracts as in performance contracts; we see no basis for a distinction.").

Indeed, the performance of a service contract is more analogous to the liability of federal

officials for performing their duties than a contractor's design and manufacture of equipment for the government.

This court thus must begin by determining whether a "uniquely federal interest" is implicated. The court concludes that the establishment of standards for maintenance and inspection of military equipment unquestionably is an area of "uniquely federal interest."

Next, the court must determine whether a "'significant conflict' exists between an identifiable 'federal policy or interest and the [operation] of state law.'" *Boyle*, 487 U.S. at 507, 108 S.Ct. at 2516 (citation omitted) (alteration in original). It seems clear that the Army's determination of standards for maintenance and inspection of its aircraft presents the potential for "significant conflict" with the operation of state law.

As noted above, in order to outline the scope of displacement of state law, the Supreme Court adopted the three-part test of *McKay* to "assure that the suit is within the area where the policy of the 'discretionary function' would be frustrated," and, to remove any incentive a contractor would have to withhold warnings of known risks. While the Eleventh Circuit has indicated that the three-part test itself applies only to design defect cases,[41] it is possible to conduct an inquiry similar to that of *Boyle* by reference to precedent examining the "discretionary function" exception to the Federal Tort Claims Act.

The Supreme Court addressed the discretionary function exception in *United States v. Gaubert*, 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991), establishing a two-part test for review of the Government's challenged conduct. The Eleventh Circuit explained the application of the test in *O'Ferrell v. United States*, 253 F.3d 1257 (11th Cir. 2001):

---

[41]*Dorse v. Eagle-Picher Industries, Inc.*, 898 F.2d 1487, 1489 (11th Cir. 1990).

First, a court must look to the nature of the challenged conduct and decide whether the conduct "violated a mandatory regulation or policy that allowed no judgment or choice." *Autery v. United States*, 992 F.2d 1523, 1526 (11th Cir. 1993). The discretionary function exception will not apply "if a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *United States v. Gaubert*, 499 U.S. 315, 322, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991). Second, if the court determines that no "statute, regulation or policy specifically prescribes a course of action," the court must then consider whether the challenged conduct "is of the kind that the discretionary function exception was designed to shield." *Id.* at 322-23, 111 S.Ct. 1267. The purpose of the exception is to "prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.* at 323, 111 S.Ct. at 1267.

253 F.3d at 1266. *See also Miles v. Naval Aviation Museum Foundation, Inc.*, No. 01-11026, 2002 WL 705224 at *5 (11th Cir. Apr. 24, 2002).

In *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), the Supreme Court stated:

It is unnecessary to define, apart from this case, precisely where discretion ends. It is enough to hold, as we do, that the "discretionary function or duty" that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of the government in accordance with official directions cannot be actionable.

*Id.* at 35-36, 73 S.Ct. at 968 (footnotes omitted).

Applying these principles to the determination of whether a contractor providing services to the government may be immune from state tort liability, and drawing a parallel to *Boyle*'s three-part test, the court finds the relevant inquiry to be as follows: (1) whether the government established or approved the manner in which the services were to be performed; (2) whether the contractor performed the services in accordance with those directions; and (3) whether the contractor

22

warned the government of dangers of which it was aware, but of which the government was unaware.

An application of those factors to the facts of this case leads the court to conclude that DynCorp is entitled to the benefit of the government contractor defense. First, the evidence establishes that the Army specified the manner in which DynCorp was to inspect and maintain the helicopters. DynCorp was required to adhere to procedures established in three Army technical manuals, and was not permitted to deviate from those procedures. The Army exercised discretion in promulgating the Technical Manuals, weighing considerations of safety, efficiency, and combat effectiveness.

It also is clear that the Army exercised discretion in determining that it was unnecessary to revise its inspection procedures in view of the FAA's Airworthiness Directive and Bell's Military Alert Bulletin. The evidence establishes that the Army considered the recommended enhanced inspection procedures, but decided not to implement them. The Army's decision was based on the Army's extensive experience with the aircraft over a forty-year period. Accordingly, the court concludes that the Army exercised its discretion in establishing the maintenance and inspection standards — i.e., the manner in which DynCorp was to perform the services pursuant to its contract with the Army — for UH-1H helicopters.

As to the second inquiry, plaintiffs contend that DynCorp breached several provisions of the contract. First, plaintiffs assert that DynCorp breached sections C.1.1 and C.1.7 of the contract, which read as follows:

> C.1.1: The performance work objective of this contract is to support the Aviation Training Brigade's required training mission with mission capable safe aircraft at the beginning of each flight period.

23

> C.1.7:  The contractor shall determine the airworthiness condition of assigned or
> attached aircraft as required by applicable regulations and publications.  Such
> determination shall be based on inspection, maintenance operational checks, and test
> flying as required by applicable Army publications and directives.[42]

Plaintiffs contend that because the vertical tail fin separated from the fuselage during flight, DynCorp

did not comply with the contract's requirement that the aircraft be airworthy and safe.  Plaintiffs'

arguments are not persuasive.  The contract requires that the inspections be performed in accordance

with "applicable Army publications and directives," and plaintiffs have presented no evidence that

DynCorp deviated from those standards when inspecting and maintaining the aircraft.

Plaintiffs also assert that DynCorp did not comply with section C1.21.4.4 of the contract,

which provided:

> (4)     Personnel must be trained to perform or inspect depot level maintenance
> covered in special repair authorizations.  This training must be task specific and
> documented in training folders.  Personnel must be trained to perform or inspect
> repairs beyond AVUM/AVIM repairs.  This training may be more general but should
> cover that use of maintenance allocation charts, procedures for requesting and
> documenting approvals for such maintenance and inspection standards and how to
> coordinate AMCOM LAR and Engineer support through M&SMB.  This training
> must also be documented in training folders.[43]

The court finds that the cited provision does not advance plaintiffs' argument, because it relates to

training personnel to perform "special repair authorizations," which are not at issue here.  Further,

there is no evidence that DynCorp failed to train its employees to follow the tailboom inspection

procedures prescribed by the Army, which consisted of visual inspection of the entire tailboom for

cracks and other deficiencies.

Plaintiffs also focus on the following language from the Army technical manual TM 55-

---

[42]Plaintiffs' Submission of Evidentiary Materials in Support of Brief in Opposition to Motion for Summary
Judgment by DynCorp (doc. no. 30), Exhibit 9, Tab L.

[43]*Id.*, Tab Q.

24

1520-210-PMD, relating to the preventive maintenance daily inspection checklist: "Note: Individual items contained in this manual are considered the minimum requirements for performing a daily inspection and must be performed." Plaintiffs contend that "DynCorp ... breached the contract by not training personnel to inspect beyond the minimum requirements, so that safety items such as these cracks would be detected and corrected."[44] Contrary to plaintiffs' assertion, the court finds that the quoted language did not require DynCorp to perform inspections other than those mandated by the Army.

Plaintiffs next contend that DynCorp breached the contract by failing to provide "quality maintenance." Plaintiffs point to the failure of the vertical fin spar and DynCorp's failure to detect cracks prior to the accident as evidence that DynCorp did not provide "quality maintenance." Additionally, plaintiffs contend that the fact that cracks were found in other aircraft during the post-accident revised inspection constitutes further evidence of inferior maintenance. Again, the court finds plaintiffs' arguments unpersuasive. DynCorp has submitted the affidavit of Jerry W. Standifer, the DynCorp aircraft mechanic who performed the 150-hour phase inspection of the accident helicopter on October 26, 1998. He stated that no cracks were visible on the vertical tail fin at that time.[45] Plaintiffs have presented no evidence that the cracks in the vertical fin spar of the accident helicopter would have been visible under the Army's inspection criteria prior to the accident. Moreover, the cracks that were found in other aircraft following the accident were detected only upon x-ray inspection, a method that was mandated by the Army *after* the accident.

In sum, DynCorp has satisfied the second element by demonstrating that it performed the

---

[44]Plaintiffs' Brief in Opposition to Motion for Summary Judgment by DynCorp (doc. no. 32), at 13.

[45]Supplement to DynCorp's Designation of Evidentiary Materials in Support of Motion for Summary Judgment (doc. no. 51), Exhibit U.

contract services in accordance with the Army's directions.

Finally, the court concludes that the third element also is satisfied. Plaintiffs contend that DynCorp was alerted to problems with the vertical fin spar of the UH-1H helicopter by the FAA's Airworthiness Directive and Bell's Military Alert Bulletin, but did not warn the Army that failing to implement the recommended inspection procedures could cause the vertical fin spar to fail. This argument is without merit. DynCorp was required to warn the Army only of dangers that were known to DynCorp, but that were not known to the Army. The evidence is clear that the Army was aware of the FAA's Airworthiness Directive and Bell's Military Alert Bulletin, but exercised its discretion when deciding not to implement the inspection procedures recommended in either warning. Further, there is no evidence that DynCorp was aware of cracks or any other problems with the vertical fin spar.[46]

### 2. Failure to Warn

With respect to "failure to warn" claims, the Eleventh Circuit has held that some aspects of the *Boyle* government contractor defense are applicable.

> On the one hand, the court agrees with the defendant that *Boyle* is not strictly limited to design defect cases. The government contractor defense, for example, could arise when the government prohibits a specific warning. On the other hand, the court agrees with the plaintiff that the three-part test of *McKay* [*v. Rockwell International Corp.*, 704 F.2d 444, 451 (9th Cir. 1983), *cert. denied*, 464 U.S. 1043 (1984)] is necessarily limited to design defect cases. The *Boyle* decision, however, is not rendered completely meaningless in "failure to warn" cases.
>
> To resolve the dilemma of applying *Boyle* to a "failure to warn" case, *Boyle's* two-pronged analysis guides the court.

---

[46]*See id.*, Exhibit V (Affidavit of J.R. Jones, DynCorp aircraft mechanic at Ft. Rucker) ("Daily inspections require that the mechanic inspect the entire aircraft for cracks and other deficiencies. We were to inspect for and report any crack found anywhere on the aircraft by recording the deficiency in the aircraft log book. ... I have never seen a crack in a vertical fin spar on a UH-1.").

*Dorse v. Eagle-Picher Industries, Inc.*, 898 F.2d 1487, 1489 (11th Cir. 1990).[47] After determining that a "uniquely federal interest" was present in the case, the Eleventh Circuit examined whether there was a significant conflict between the state-imposed duty of care (the duty to warn of a danger) and the duty imposed by the government contract (the duty to manufacture and deliver cement containing asbestos), and found that there was no conflict at all. The Eleventh Circuit further observed that the defendant could have complied with both its contractual and state tort law duties. *Id.* at 1490. Accordingly, *Boyle* was not applicable to the failure to warn claims at issue there.

Similarly, in the present action there is no conflict between the state-imposed duty to warn of the danger and the contractual duty for DynCorp to inspect and maintain helicopters for the Army.

Plaintiffs contend that DynCorp failed to warn the Army of the seriousness of the problems documented in the FAA's Airworthiness Directive and Bell's Military Alert Bulletin. Under Alabama law,

> [a] negligent failure-to-adequately-warn case cannot be submitted to a jury unless there is some evidence that the allegedly inadequate warning would have been read and heeded and would have kept the accident from occurring.
>
> ...
>
> Where a warning is necessary, the warning need only be one that is reasonable under the circumstances and it need not be the best possible warning. There is no duty to warn of every potential danger or to explain the scientific rationale for each warning, but only a duty to warn of those dangers which the owner or user would not be aware

---

[47]In contrast, other Circuits have modified the three-part *Boyle* test to apply to "failure-to-warn" claims. *See, e.g., Densberger v. United Technologies Corporation*, 283 F.3d 110, 119 n.11 (2d Cir. 2002) ("The three requirements of the *Boyle* test for failure-to-warn cases are: (1) 'government control over the nature of product warnings;' (2) 'compliance with the Government's directions;' and (3) 'communication to the Government of all product dangers known to it but not to the Government.'") (citation omitted); *Kerstetter v. Pacific Scientific Company*, 210 F.3d 431, 438 (5th Cir. 2000) ("State law is displaced if (1) the United States exercised discretion and approved the warnings; (2) the contractor provided a warning that conformed to the approved warnings; and (3) contractor warned about the dangers it knew, but the government did not."); *Tate v. Boeing Helicopters*, 140 F.3d 654, 656-57 (6th Cir. 1998) (state law is displaced when the contractor shows: "(1) the United States exercised its discretion and approved the warnings, if any; (2) the contractor provided warnings that conformed to the approved warnings; and (3) the contractor warned the United States of the dangers in the equipment's use about which the contractor knew, but the United States did not.").

of under the particular circumstances of his use of the product in question.

*Gurley v. American Honda Motor Company, Inc.*, 505 So. 2d 358, 361 (1987) (citations omitted).

Basically, plaintiffs contend that the Army was not sufficiently warned of the "seriousness" of the problems with the vertical fin spar, as evidenced by the Army's failure to implement either the FAA's or Bell's enhanced inspection requirements, or otherwise take preventive measures. As discussed above, there is no question that the Army was aware of problems with the vertical fin spar. The FAA specifically states that the Airworthiness Directive mandating enhanced inspection procedures was prompted by "two accidents involving in-flight failures of the tailboom vertical fin spars."[48]  The Military Alert Bulletin issued by Bell calls for *immediate* inspection of the tailboom fin spar upon receipt of the bulletin, and each eight flight hours thereafter.[49]  Again, the Army had not experienced the cited problems with the vertical fin spar during its extensive experience with the aircraft.

The Army also was aware, prior to the issuance of Bell's Military Alert Bulletin, of a crash of a UH-1H helicopter sold as surplus or donated to the Colombian army, due to a vertical fin spar failure.[50]  Stephen D. Monaco, an aerospace engineer in the Army's Department of Aviation Engineering, stated that reports of the accident investigation were reviewed, as well as the maintenance procedures used by the Colombian army.  Based on that information, and the manner in which the aircraft was flown — *i.e.,* "in a much more rigorous manner and at much heavier gross weights and ... near the ragged edge of speed"[51] — the Army determined that further action was not

---

[48]Designation of Evidentiary Materials in Support of Motion for Summary Judgment by Bell Helicopter Textron Inc. (doc. no. 22), Exhibit I, at 1.

[49]*Id.*, Exhibit J, at 1.

[50]Plaintiffs' Submission of Evidentiary Materials in Support of Brief in Opposition to Motion for Summary Judgment by Bell (doc. no. 31), Exhibit 1, at 36-37.

[51]Designation of Evidentiary Materials in Support of Motion for Summary Judgment by Bell Helicopter Textron

warranted.

There is no evidence that DynCorp withheld knowledge from the Army about problems with the vertical fin spar, or that the Army otherwise was not aware of such problems. Moreover, DynCorp had no separate duty to warn UH-1H helicopter pilots, such as plaintiff Francis Mark Crawford. *See Purvis v. PPG Industries, Inc.*, 502 So. 2d 714, 720 (Ala. 1987) ("A manufacturer is not liable if it has made reasonable efforts to convey product information and/or warnings that, because of circumstances beyond its control, were not passed on to or were not received by, the ultimate user."). Accordingly, the court concludes that plaintiffs' failure-to-warn claim must fail.

## II. CONCLUSION

For the foregoing reasons, the court concludes that DynCorp's motion to strike is due to be granted in part and denied in part, and the motion for summary judgment is due to be granted. A separate order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this _**28th**_ day of May, 2002.

_____

United States District Judge

---

Inc. (doc. no. 22), Exhibit T, at 39.